UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIELLE J. KREUZER, | ) | CASE NO. 5:16-cv-3026 |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | JUDGE SARA LIOI |
| | ) | |
| OHIO DEPARTMENT OF | ) | |
| TRANSPORTATION | ) | |
| DISTRICT 4, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendant Ohio
Department of Transportation ("ODOT"). (Doc. No. 32 ["Mot."].) Plaintiff Danielle J. Kreuzer
("Kreuzer") opposed the motion (Doc. No. 34 ["Opp'n"]), and ODOT replied. (Doc. No. 35
["Reply"].) For the reasons discussed below, the motion is GRANTED.

## I. BACKGROUND

Kreuzer was employed by ODOT from 1987 through her termination on or about May
15, 2015. (Doc. No. 28 (Deposition of Danielle Kreuzer ["Kreuzer Dep."]) at 253[1]; Doc. No. 32-
1 ["Termination Letter"] at 852.) When she began working for ODOT she was a highway
worker, but over the years she was promoted several times. (Kreuzer Dep. at 253-54.) From 2006
until she was terminated, she held the position of LPA construction monitor, working in the
Construction – as opposed to the Maintenance – Department at the Stark County garage. (*Id.* at
254-55.) As an LPA construction monitor, she performed tasks involving "oversight of federal
money to local municipality construction projects." (*Id.* at 256.)

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing
system.

Beginning in approximately 2012, Kreuzer's work was supervised by David James. (*Id.* at 260.) Under James, she worked the hours of 7:00 am through 3:00 pm with an unpaid lunch and two fifteen-minute paid breaks. (*Id.* at 269.) During the time pertinent to this case, Kreuzer's time was tracked through an electronic system called Kronos by punching in and out on her computer. (*Id.* at 260-61.) From the time ODOT began using the system in 2013 through her termination, James supervised Kreuzer's Kronos kept time, with one exception: from early December 2014 through the end of March 2015, Kreuzer's Kronos supervisory authority was transferred to Stark county manager, Tim Guth, while she was performing radio operator duties through the Maintenance Department in addition to her job as an LPA Construction Monitor. (*Id.* at 269-70.)

**A. Three Incidents of Alleged Sexual Harassment**

Guth and Kreuzer both worked in the Stark County garage at all times pertinent to this case, but they were in different departments – he in Maintenance, she in Construction. (*Id.* at 271; Doc. No. 29-4 (Affidavit of Timothy Guth ["Guth Affidavit"]) at ¶¶ 1, 3.) The two had minimal contact with one another, but Kreuzer claims that at least three of their interactions between April 2013 and the summer of 2014 were hostile in nature. For purposes of this motion for summary judgment, Kreuzer's recitation of these incidents will be taken as true.

The first incident occurred in April 2013. On that occasion, Guth entered the garage kitchen while Kreuzer was preparing her breakfast. (Kreuzer Dep. at 276.) Without saying a word, he approached Kreuzer and stood with his chest one inch from her shoulder. (*Id.* at 276.) Kreuzer found Guth's body language to be aggressive, but did not say anything to Guth or report the incident. (*Id.* at 272-73, 277, 280.) She did stop making her breakfast there in the mornings. (*Id.* at 273.)

After the incident in the kitchen, Kreuzer tried to "steer[] clear" of Guth. (*Id.* at 273.) There was not another incident between the two until the late winter or early spring of 2014 when Kreuzer slipped and fell on ice in the parking lot. (*Id.* at 273, 287.) Guth happened to be there when she entered the garage so she informed him of her fall. (*Id.* at 273-74.) She then told him that she was going to go to the bathroom to inspect her injuries to evaluate whether she should go to the ER or fill out an accident report. (*Id.*) As she walked to the bathroom, Guth said in a "playful" tone, "'Hey, let me know if you need any help in there with that.'" (*Id.* at 274, 418.) Kreuzer responded "No, thank you," gave him a dirty look, and kept walking. (*Id.* at 274, 287.) No one else was present during this incident, and Kreuzer did not report the interaction because she "just thought that it wasn't significant enough at that point[.]" (*Id.* at 288.)

Finally, in the summer of 2014, Guth came into Kreuzer's office and aggressively asked, "'Just what do you do all day anyway?'" (*Id.* at 275, 290-91, 418.) While she was answering the question, Guth "glaze[d] over." (*Id.* at 275, 290.) Kreuzer interpreted his question coupled with his disinterest to be an "aggressive move." (*Id.* at 275.) Before that point, she had been doing her job without issue. (*Id.* at 275.) After the five-minute conversation, she claims she felt threatened. (*Id.* at 275, 290.) But she did not report the incident because she did not want to bring attention to herself for an incident that, in her opinion, "was inappropriate but not monumental[.]" (*Id.* at 305.)

But Kreuzer testified that, "[a]t that point, [she] was feeling threatened after what [she] had seen take place in the district." (*Id.* at 275.) Specific to Guth, Kreuzer knew of rumors involving female employees, one of which went on disability soon after Guth started as Stark County manager and another of a woman he had written up for not working enough overtime.[2]

---

[2] One of Kreuzer's female coworker's, Kristine Mayle, characterized Guth's workplace demeanor as "[l]ight-hearted. I mean, not mean." (Doc. No. 30 (Deposition of Kristine Mayle ["Mayle Dep."]) at 740.)

(*Id.* at 271-72, 275, 278-80, 291-94, 301-04.) On a broader company level, during the summer of the last incident, two women had been stripped of their positions as department heads and another three had been denied promotions. (*Id.* at 274-75, 297-301; Doc. No. 26 (Deposition of Michael Donaldson ["Donaldson Dep."]) at 161-63.) According to Kreuzer, she had seen this type of discrimination and worse during her twenty-eight years of service at ODOT and had learned to keep her head down and "develop a thick skin[.]" (Kreuzer Dep. at 280-86, 288, 294-97.)

**B. Radio Operation during the Winter of 2014-2015**

Even though she had had negative experiences with Guth previously and felt free to refuse, Kreuzer agreed to allow Guth take over her Kronos supervision in November 2015 so that she could perform some radio operator duties that winter.[3] (*Id.* at 270-71, 309; *see* Doc. No. 29 (Deposition of Timothy Guth ["Guth Dep."]) at 662-63.) Prior to this time, Kreuzer had sought and been given approval to assume the radio operator duties in addition to her tasks as LPA Construction Monitor, provided she maintained her 40 hours in her original position. (Kreuzer Dep. at 306-07.) During that winter, she regularly declined extra shifts as radio operator, working fewer than 80 hours during the season on a volunteer basis. (*Id.* at 309-10, 313; Guth Dep. at 668-69.) But Kreuzer claims this period of time was extremely difficult for her, due in part to Guth.

According to Kreuzer, her troubles began the moment Guth learned through an email that she would be helping with radio duties, a Maintenance Department job. Upon receiving the email, Guth called a meeting with Kreuzer and the other radio operator, Kristine Mayle. (Kreuzer

---

[3] During testimony, Kreuzer repeatedly referred to a grievance that necessitated her need to perform radio operator duties. (Kreuzer Dep. at 270-71, 306-07, 310-11, 314, 317-19, 339, 419.) But the grievance in question is immaterial to this case as it pertained solely to a labor-management dispute. Specifically, Kristine Mayle filed the grievance contesting management performing radio operator duties, which she believed to be a union job that should be performed by a member of the labor workforce. (Mayle Dep. at 736-37.)

Dep. at 314-15.) At the meeting, Guth threatened to change Kreuzer's shift to afternoons so that she could cover the 10:00 a.m. to 10:00 p.m. radio shift.[4] (*Id.* at 315.) This caused Kreuzer a great deal of stress. The next day, she went directly to district headquarters to speak to Dave Reich about the situation. (*Id.* at 315-17.) Kreuzer told Reich about the threat and asked "'what if I told you I can't do this?'" (*Id.* at 317-18; Doc. No. 31 (Deposition of David Reich ["Reich Dep."]) at 776-77.) Reich advised her that she did not "'want to open that can of worms.'" (Kreuzer Dep. at 318.) Reich also tried to reassure Kreuzer by telling her that her shift would not be changed and that he would talk to Guth. (*Id.* at 319; Reich Dep. at 776.) Kreuzer did not know what the "can of worms" was, but she did know that talking to a supervisor was rarely a good thing. (Kreuzer Dep. at 319, 326-27, 334.)

After the discussion, Guth did not bring up a possible shift change again. Instead, Kreuzer was asked to perform radio operations on an as-needed basis. (*Id.* at 319-21; Guth Dep. at 667-69.) Between her original duties and those additional radio operations she agreed to perform, her shifts were long, sometimes requiring her to work until 10:00 p.m. only to return at 7:00 a.m. the next morning. (Kreuzer Dep. at 321.) Because the radio operations were needed only on days of impending snowstorms, Kreuzer could not readily predict when she would be asked to operate the radio so as to adequately prepare for the extended hours on site. (*Id.* at 320-21.) The unpredictability, coupled with long hours of sedentary activity, clashed with her ADHD and caused her health to deteriorate. (*Id.* at 328-29.) But Kreuzer did not notify anyone of her struggles due to her mental health condition, instead choosing to "self-accommodate[]." (*Id.* at

---

[4] Guth's characterization of this conversation is somewhat different, but the necessity of a shift change is consistent among both Guth and Kreuzer's accounts. (Guth Dep. at 670-71.)

322-23.) "Self-accommodation" did not include requesting to flex her time to make the shifts more manageable, even though she had been approved to do so previously.[5] (*Id.* at 321, 324.)

At some point during that winter, Kreuzer snapped and decided that she would "do everything [she could] to stay out of this garage." (*Id.* at 330-31, 337-38.) The catalyst for this decision was when a coworker, Mike Donaldson, said he would no longer visit her office for morning conversations, which Kreuzer admitted could be "animated or loud[.]" (*Id.* at 329-30.) Donaldson's decision stemmed from Guth's conduct, insinuating Donaldson was not welcome. But Donaldson testified that it was not the fact that he was talking to Kreuzer with which Guth took issue. (Doc. No. 26 (Deposition of Michael Donaldson ["Donaldson Dep."]) at 150-52.) Instead, Donaldson cited Guth's reputation as a "stickler for the black-and-white rules" who, "if you were in his facility[,] he always wanted to know what you were doing there, why you were there."[6] (*Id.* at 152-53, 168.) While Kreuzer cites this as a turning point, she and Guth never discussed the situation. (Kreuzer Dep. at 336.)

Around this time, one other incident occurred which resulted in the end of Kreuzer's radio operation duties. Briefly, one day while Kreuzer was in a meeting with James discussing a matter to do with her job as LPA Construction Monitor, the Stark County garage repeatedly called Kreuzer. (*Id.* at 333.) While the phone rang and rang, she told James,

---

[5] When asked why she had not proposed flex time, Kreuzer cited the differences between the operations of the Maintenance and Construction Departments without any mention to her gender. (Kreuzer Dep. 324-25.) Regarding Guth specifically, Kreuzer testified that his management style was strictly regimented, as was the way in the Maintenance Department, but she could not speak to whether he treated men and women differently since she had spoken exclusively to female colleagues about the matter. (*Id.* at 325)

[6] When asked whether "there [were] issues with [his] performance as the Stark County maintenance manager that lead to [him] being placed in the construction department," Guth admitted that while "there [were] never any real issues" with his performance reviews, the quality of life numbers were not "extremely high." (Guth Dep. at 649.) Guth went on to explain that the quality of life survey asked "various questions about management." (*Id.*) Though he tried to improve his performance in management through a performance improvement plan, he was eventually transferred out of the position of county manager, to his surprise. (*Id.* at 651-52.)

"I just can't do this anymore. I can't do this. I can't work for two different departments and, you know, please and do both jobs well because the one job was somewhat ridiculous. I have to tell him I can't do this anymore."

(*Id.*) In response, James remarked "'Yeah, they've been really fucking with a lot of the women up here too.'" (*Id.* at 338-39.) James elaborated, stating that he knew of women being asked to perform additional duties beyond the scope of their job descriptions, such as answering phones. (*Id.* at 340.) But Kreuzer herself did not personally comment on any alleged disparate treatment of women, instead pinning any disparate treatment on the "long-running contention between the two departments[.]" (*Id.* at 339.)

After the conversation with James, Kreuzer returned to the Stark County garage and told Guth along with Greg Umpleby, the transportation manager of the Stark County Maintenance Department, that she could no longer take shifts operating the radio. (*Id.* at 334, 340-41;Guth Dep. at 672-74.) Kreuzer disclosed her medical condition of ADHD and told of her struggles managing both positions. (Kreuzer Dep. at 334.) Though Guth responded that he "g[o]t it" and that it was "okay" and "no problem," the calls from the Maintenance Department to operate the radio did not stop. (*Id.* at 335, 341-42.) Additionally, even though she did not operate the radio after that day, Guth continued to supervise her Kronos timekeeping through March, giving him the authority to approve her leave pursuant to ODOT policy.[7] (*Id.* at 343-46.)

### C. Investigation

On March 5, 2015, Guth claims he received an anonymous phone call notifying him that Kreuzer was returning home for several hours a day and parking her ODOT-owned vehicle in her garage.[8] (Guth Dep. 674-75, 686-87; *see* Doc. No. 29-1 ("Email Communication re Phone

---

[7] Guth requested that timekeeping authority be transferred back to James on March 13, 2015. (Guth Dep. at 693; Doc. No. 29-3 ("Email re Kronos B").) The transfer became official on or about March 22, 2015. (Kreuzer Dep. at 346-47; Guth Dep. at 692-93; Doc. No. 28-3 ("Email re Kronos A"); Email re Kronos B.)

[8] Kreuzer does not believe such a phone call was ever placed. (Kruezer Dep. at 356-57, 367-68, 406.)

Call").) The caller stated that at the end of the day, Kreuzer would leave in her ODOT-owned car and return shortly after in her personal vehicle. (Guth Dep. at 675.) Guth did not ask the female caller for her name or contact information or establish how the caller came about the information. (*Id.* at 676.) Upon receipt of the phone call, Guth contacted Reich, who told him to "play this one by the book." (*Id.* at 679; Reich Dep. at 780-81.) The matter was then referred to business and human resources ("BHR"), and John Shore of the Office of Investigative Services conducted an independent investigation. (Guth Dep. at 680, 683-4, 690; Reich Dep. at 772, 781-82; Email Communication re Phone Call; Guth Affidavit.) The investigation began with a GPS tracking device being placed placed on Kreuzer's ODOT-owned vehicle. (Guth Dep. at 683-84; Doc. No. 28-4 ("Investigation Report") at 469.) After data had been collected over the course of approximately one month, Kreuzer was called in to discuss the findings with Shore. (Kreuzer Dep. at 360-62, 369-70; Investigation Report at 469-71, 473-75.)

During the interview, Kreuzer did not dispute the findings of the investigation, showing Kreuzer had misused approximately 27.9 hours of ODOT time, and answered all questions honestly.[9] (Investigation Report at 469-71, 477-578.) She even recalls responding, "'Yes, 100 percent.'" when Shore stated, "'It appears that you were just killing time.'" (Kreuzer Dep. at 369-70.) At no time during the interview did Kreuzer excuse her behavior by explaining her mental health or any issues she had with Guth. (*Id.* at 372, 382-84.)

When the interview concluded, Kreuzer was informed that she was placed on administrative leave, escorted from the building and her "keys and everything" were taken from

---

[9] For example, Kreuzer testified that she knew taking her ODOT-owned vehicle home had been a violation of ODOT policy since the early 2000s (Kreuzer Dep. at 348), that she did so anyways, though she claims that she was still working while she was at home. (*Id.* at 358-59.) She also testified, however, that she was never given permission to work from home and that it was "highly unlikely" that her supervisor, James, gave anyone permission to work from home. (*Id.* at 368-69; James Dep. at 208-09.) Additionally, Kreuzer concedes that she sometimes conducted personal business on ODOT time, such as shopping at Gabriel Brothers. (Kreuzer Dep. at 371.)

her. (*Id.* at 359, 70; Investigation Report at 474; Doc. No. 28-5 ("Administrative Leave Letter").) She then contacted her union representative, Rusty Burkepile. (Kreuzer Dep. at 360.) After her first grievance hearing, Burkepile "essentially said you'll never get your job back and it doesn't matter what you have. You're never going to get your job back." (*Id.* at 363, 385.)

After being advised that she would not get her job back, Kreuzer emailed James on May 5, 2015, to inform him that she would be applying for disability due to her ADHD and explain the background of the current situation. (*Id.* at 393.) In the email, she described her failing mental health, attributing it to her claim that "[t]he Stark Garage [was] managed with a mentality of fear and bullying." (Doc. No. 27-1 ("Email re Disability Retirement").) Twice she mentioned her gender; first, stating that her anxiety increased "as another female employee was threatened about not working the required amount of overtime," and again when referring to her abusive ex-husband, who was a fellow ODOT employee claiming, "This situation, along with being female and my office location, increased [my] isolation by 10 fold." (*Id.* at 243.)

While James is "fairly certain [he] passed [the email] on to [ ] labor relations," no one contacted him about it. (Doc. No. 27 (Deposition of David James ["James Dep."]) at 218.) Instead, on May 15, 2015, Kreuzer was fired. (Termination Letter.) Kreuzer filed an EEOC complaint on November 20, 2015, stating she had endured continuing sex discrimination from November 2014 through her termination in May 2015, as well as retaliation. (Doc. No. 1-1 ("EEOC Complaint") at 1.)

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, the Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on

which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*. (citation omitted).

## III. DISCUSSION

"Title VII [of the Civil Rights Act of 1964] is central to the federal policy of prohibiting wrongful discrimination in the Nation's workplaces and in all sectors of economic endeavor." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). The prohibitions of Title VII are two-fold. *See id.* First, employers may not engage in "an unlawful employment practice," including discharging an employee or discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of [the employee]'s race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Beyond this foundational prohibition, it is also considered an "unlawful employment practice … to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Here, Kreuzer claims

that ODOT violated Title VII by permitting a gender-based hostile work environment and by terminating her in retaliation for complaining about said environment.[10]

### A. Hostile Work Environment

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' [*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)], that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' *id.* at 67 … (internal brackets and quotation marks omitted), Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

The analysis of a Title VII hostile work environment claim differs slightly depending upon whether the alleged harasser was a supervisor or a coworker. Here, Kreuzer argues that Guth is her supervisor.[11]   (Opp'n at 1035-36.) But "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim[.]" *Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013). While Guth was arguably one of Kreuzer's "supervisors" during the months of December 2014 through March 2015 when he was responsible for tracking Kreuzer's time in ODOT's electronic timekeeping system, none of the three incidents alleged in support of her Title VII hostile work environment claim took place during this time period. (Kreuzer Dep. at 270.) Because Kreuzer cites no facts to support that Guth engaged in sex-based

---

[10] Although Kreuzer initially asserted a claim of sex discrimination in addition to the claims of hostile work environment and retaliation, she no longer wishes to pursue the claim of sex discrimination.   (Opp'n at 1023.) Accordingly, such claim is abandoned.

[11] The argument that Guth was a supervisor contradicts her testimony with respect to the second incident, which was arguably sex-based harassment. When asked why she had not reported Guth's comments, Kreuzer answered, "Just -- you know, I assumed at that point, since he was not directly involved in my -- he was not my boss. He was just a coworker. I just really brushed it off….again, he had no influence over my life at ODOT. I didn't work for him." (Kreuzer Dep. at 304-05.)

discriminatory conduct during the time he was arguably her supervisor, he must be treated as a coworker for purposes of this analysis. Therefore, to defeat summary judgment, Kreuzer must establish a *prima facie* case by showing that:

> (1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (citations omitted). There is no dispute as to the first element, but the other three remain in contention.

Before analyzing each of the three disputed elements, the Court will briefly review the three incidents alleged in support of the claim, described more fully above.[12]

(1) In April of 2013, Kreuzer was preparing her breakfast in the garage kitchen, as she did most mornings, when Guth entered the room. (Kreuzer Dep. at 276.) No words were exchanged, but Kreuzer characterized Guth's body language as "aggressive," claiming he "got in [her] personal space and just stood there[.]" (*Id.* at 272-73, 276-77.) Specifically, Kreuzer claims there was less than one inch of space between her shoulder and his chest. (*Id.* at 276.)

(2) Nearly a year later, in the late winter or early spring of 2014, Kreuzer slipped and fell on ice in the parking lot. (*Id.* at 273, 287.) When she told Guth about the fall and informed him that she was going into the bathroom to inspect her injuries, Kreuzer claims Guth playfully replied, "'Hey, let me know if you need any help in there with that.'" (*Id.* at 274, 418.)

(3) During the summer of 2014, Kreuzer testified that Guth came into her office and aggressively asked, "'Just what do you do all day anyway?'" (*Id.* at

---

[12] The EEOC Complaint makes no reference to the first incident. (EEOC Complaint.)

275, 289-91, 418.) When Kreuzer answered the question, she claims that Guth "glaze[d] over." (*Id.* at 275, 289-91.)

    1. *Based on Sex*

Title VII sex-based harassment need not be sexually charged, but instead may include any "harassing behavior…directed at women and motivated by discriminatory animus against women[.]" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (collecting cases). Therefore, even though the first and third incidents involved no sexual innuendo, they may qualify as sex-based harassment prohibited by Title VII. But Kreuzer must first show that Guth's conduct was motivated by discriminatory animus.

To support her argument that Guth's conduct was motivated by her gender, Kreuzer cites to "rumors" she heard from other female coworkers[13] and to the male-dominated environment at ODOT, in general. (Kreuzer Dep. at 271-72, 274-75, 278-86, 291-304.) But Kreuzer admits that she does not know whether his treatment of subordinates differed between men and women because she only spoke to female workers. (*Id.* at 325.) Kreuzer has provided no evidence to establish that Guth's alleged aggressive behavior was motivated by discriminatory animus, and not merely poor management style. *See, e.g., Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (raising the issue of whether discrimination was sex-based, but proceeding with the analysis) (citation omitted); *Conley v. City of Findlay*, 266 F. App'x 400, 409 (6th Cir. 2008) (upholding summary judgment when plaintiff was unable to prove the alleged mistreatment was because of her sex); *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (reasoning that a Title VII hostile work environment claim was properly dismissed because

---

[13] The factfinder may consider "evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence." *Hawkins*, 517 F.3d at 335 (citing, *inter alia*, *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir. 2000)).

"[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender"). Since Kreuzer cannot show there is a genuine issue of material fact that the first and third incidents of alleged harassment related in any way to her gender, she fails to establish that any alleged harassment was actionable under Title VII.

2. *Severe or Pervasive*

Assuming *arguendo* that all three incidents were based on Kreuzer's sex, Kreuzer must then show that Guth's conduct was "'sufficiently severe or pervasive to alter the conditions of [her] employment[.]'" *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67). That determination is made by the factfinder who must consider the totality of the circumstances and apply both an objective and subjective standard. *See Harris*, 510 U.S. at 21-23; *Hawkins*, 517 F.3d at 333. A non-exhaustive list of factors that may be considered include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Because this is a fact-sensitive inquiry, "[s]ummary judgment is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment." *Hawkins*, 517 F.3d at 333 (citing *Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998)). But the Court must be mindful of the fact that Title VII is not "a general civility code[.]" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998); *see also Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir. 2000) (citation omitted). Instead, "it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81. "'[S]imple teasing,' [*Oncale*,

523 U.S. at 82], offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

Here, ODOT concedes that "the Court may assume that Kreuzer subjectively found Guth's conduct to be hostile," satisfying the subjective standard. (Reply at 1046.) But ODOT argues that Kreuzer has failed to provide sufficient evidence to satisfy the objective standard. (Mot. at 819-21; Reply at 1046.) Therefore, the issue remains as to whether a reasonable person in Kreuzer's position would have considered the conduct alleged to be sufficiently severe or pervasive as to create a hostile work environment under Title VII. *Harris*, 510 U.S. at 21; *see also Oncale*, 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'") (citation omitted).

The objective standard is not one easily met, with courts heeding the Supreme Court's instruction that, to be actionable under Title VII, "conduct must be *extreme* to amount to a change in the terms and conditions of employment[.]" *Faragher*, 524 U.S. at 788 (emphasis added); *see, e.g. Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 289-90 (6th Cir. 2017) (upholding summary judgment for the employer when a male supervisor regularly treated male employees differently than female employees and made demeaning remarks to female employees); *Burnett*, 203 F.3d at 985 ("[A] single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment."); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 344-45, 351-52 (6th Cir. 2005) (concluding the following facts insufficient to establish a *prima facie* hostile work environment claim: a male supervisor told

sexual jokes in front of a female subordinate, twice touched a vibrating pager on her upper thigh and asked if it "felt good," and acted as if he was trying to look down her overalls in front of another supervisor); *Hale v. Vill. of Madison*, 493 F. Supp. 2d 928, 931-32, 937-38 (N.D. Ohio 2007) (concluding there was no genuine issue of material fact when, over the course of approximately five years, a male employee made "vulgar comments" to a female employee "on a monthly basis rather than a frequent basis," leaned in several inches "as if to kiss her" several times, and once "leaning his body hard enough against [her] so as to knock her off her feet").

In this case, the three discrete incidents occurred over the course of nearly a year and a half. While the first involved an intrusion of "personal space," none involved any physical contact. Further, the second incident involving an arguably sexually-charged remark was made out of earshot of any coworkers and was more akin to "the sporadic use of abusive language, gender-related jokes, and occasional teasing," *Faragher*, 524 U.S. at 788 (quotation marks and citation omitted), than "physically threatening or humiliating" language. *Harris*, 510 U.S. at 23. Kreuzer herself stated that she did not report the incident because she "just thought that it wasn't significant enough at that point[.]" (Kreuzer Dep. at 287-88.) Similarly, Kreuzer characterized the third incident as "inappropriate but not monumental," stating, "all he did was ask me what I did all day." (*Id.* at 305.)

Although this is a fact-sensitive inquiry, considering the totality of the circumstances, including Kreuzer's descriptions of the incidents, the facts do not support an inference that Guth's conduct was "so objectively offensive as to alter the 'conditions' of [a reasonable person in her position's] employment." *Oncale*, 523 U.S. at 81. In fact, the incidents did not even change the conditions of Kreuzer's employment as she continued working without issue for several months, at which time she agreed to allow Guth to oversee her time using the Kronos

system. Because Kreuzer's allegations fall far short of creating a genuine issue of material fact as to whether Guth's conduct was sufficiently severe or pervasive to create a hostile work environment actionable under Title VII, she fails to establish the third element of the claim.

### 3. *Knew or Should Have Known*

Finally, even if Guth's conduct was sex-based and "severe or pervasive," ODOT would be vicariously liable "only if it was negligent in controlling working conditions." *Vance*, 570 U.S. at 424. Here, Kreuzer admits that she never told anyone about any of the incidents alleged. (Kreuzer Dep. at 280, 287-88, 305). Because there is no evidence that ODOT "knew or should have known" about the alleged harassment, *Hawkins*, 517 F.3d at 338, ODOT may not be vicariously liable for any alleged Title VII hostile work environment. Therefore, since Kreuzer has failed to establish that a genuine issue of material fact exists as to three of the four elements of this claim, ODOT is granted summary judgment.

### B. Retaliation

"In an action under Title VII, the plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted). Here, Kreuzer presents no direct evidence of retaliation so she must establish a *prima facie* case by showing:

> (1) that she engaged in protected activity; (2) that defendant knew of this exercise of her protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; *and* (4) that there was a causal connection between the protected activity and the adverse employment action.

*Fenton v. HiSan, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999) (emphasis in original) (citation omitted). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but

one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citation omitted).

### 1. *Protected Activity*

ODOT first argues that Kreuzer's retaliation claim must fail because she did not satisfy the first element of engaging in "protected activity." (Mot. at 816-17.) To qualify as "protected activity," the plaintiff "must establish that he challenged an employment practice that he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). While the plaintiff need not make a formal complaint, "Title VII does not protect an employee [whose] opposition is merely a 'vague charge of discrimination.'" *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (further citations omitted).).

To support her claim that she engaged in protected activity under Title VII, Kreuzer cites verbal complaints made to her supervisors, Reich and James, as well as an email sent to James after the investigation was complete but prior to her termination. (Opp'n at 1037.) Both of her verbal complaints referred only to her inability to work as a radio operator under Guth's supervision; she made no mention of her gender or mental health, let alone believed illegal activity.[14] (Kreuzer Dep. at 317-19, 326-27, 333.) It was James who she says brought up a comment of "fucking with a lot of women." (*Id.* at 338-40.) With respect to the email to James, Kreuzer referred to her gender twice but neither brief mention alluded to any perceived illegal sex-based harassment or discrimination. (Email re Disability Retirement.)

---

[14] Though Kreuzer does not cite her conversation with Guth and Umpleby as a complaint resulting in retaliation, this interaction also involved no discussion of gender or illegal activity. (Kreuzer Dep. at 334-35.) Instead, Kreuzer merely explained her inability to manage the radio operation duties in addition to her job as LPA Construction Monitor. (*Id.*)

Unlike the plaintiff in *Yazidan* who complained of not only management style but also discriminatory conduct, Kreuzer's complaints prior to the investigation relate solely to management style, if that. *See* 793 F.3d at 647. The two also differ in that the plaintiff in *Yazidan* repeatedly made mention of his belief that legal action could result from the conduct, putting the employer on notice that illegal conduct was alleged to have occurred; Kreuzer made no mention of any believed illicit activity, simply complaining she could not adhere to the demands of performing the duties of both positions. *See id.* at 646. In sum, there is no evidence to suggest that Kreuzer's complaints were "protected activity" under Title VII as none make even a passing reference to a belief that Title VII prohibited activity had occurred. Thus, Kreuzer has failed to establish the first prong of a *prima facie* case.

2. *Causal Connection*

Even if Kreuzer's complaints did constitute "protected activity," she fails to establish that they were a but-for cause of her termination. The fourth prong of this test requires that engagement in the protected activity was not merely a "'motivating' or 'substantial' factor in the employer's decision." *Nassar*, 570 U.S. at 348 (citation omitted). Instead, "a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 362. In opposition, Kreuzer attempts to explain the chain of events which she believes led to her termination, evincing the alleged retaliation. (Opp'n at 1037-39.) Briefly, she speculates that there was no anonymous phone call which led to the investigation. Kreuzer believes that Guth used the phone call as a guise in response to her complaints to Reich and James which were relayed to Guth along with her refusal directly to Guth to continue performing radio operations. Further, she alleges that rather than giving her a warning, ODOT completed the investigation in an attempt to remove her

from her position. Finally, Kreuzer claims that, after the investigation had been complete and she had sent the email, ODOT chose to terminate her instead of giving her lesser discipline to avoid investigation into the complaint.

In sum, Kreuzer appears to allege that "but for" her complaints to Reich and James about her inability to work as a radio operator under Guth's supervision, Guth would not have initiated an investigatory process. And "but for" those same complaints, the investigation uncovering the extent of her conduct would not have been completed; instead, she would have only been given a warning at the start of the investigation when her conduct was initially discovered. And finally, "but for" her email to James, she would have received a lesser form of discipline as opposed to termination.

Kreuzer claims temporal proximity supports her theory of retaliation, but the facts support the opposite conclusion. When determining but-for causation was appropriate for Title VII retaliation claims, the Supreme Court hypothesized,

> Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation.

*Nassar*, 570 U.S. at 358. Kreuzer provides no evidence to suggest that that is not precisely what occurred here. At no time prior to the investigation did Kreuzer herself make any complaint of illegal sex-based discriminatory conduct on the part of Guth. Even when she was interviewed through the course of the investigation, she did not suggest that Guth's conduct was illegal or sex-based. Instead, she wrote the email explaining her conduct found to be in violation of ODOT policy only after she was told that termination was likely. Even then, the email makes only a passing reference to her gender without any allegation that she believed Guth's conduct itself to

be sex-based or illegal. Additionally, it was several months after her termination that she first filed the EEOC complaint alleging sex-based discrimination. (EEOC Complaint.)

Kreuzer points to nothing in the record, including her testimony, which would arguably suggest that her complaints were a but-for cause of her termination.

Because Kreuzer has produced no evidence from which a reasonable jury could conclude she engaged in protected activity, let alone that her engagement in such activity was a but-for cause of her termination, there is no genuine issue of material fact and summary judgment is granted to ODOT.

## IV. CONCLUSION

For all of the foregoing reasons, ODOT's motion for summary judgment is GRANTED, and this case is closed.

**IT IS SO ORDERED**.

Dated: August 13, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**